| UNITED STATES DISTRICT COURT | EASTERN DISTRICT OF TEXAS |
|---|---|

| UNITED STATES OF AMERICA | § | |
|---|---|---|
| | § | |
| *versus* | § | CASE NO. 4:14-CR-91(28) |
| | § | |
| FRANCISCO BALDERAS-MEJIA | § | |

## MEMORANDUM AND ORDER

Pending before the court is Defendant Francisco Balderas-Mejia's ("Balderas-Mejia") Motion to Compel Compassionate Release (#944), wherein he requests that the court release him from imprisonment pursuant to 18 U.S.C. § 3582(c)(1)(A) due to the threat of Coronavirus Disease 2019 ("COVID-19"). The Government opposes the motion (#955). After conducting an investigation, United States Probation and Pretrial Services ("Probation") recommends denying the motion. Having considered the motion, the Government's response, Probation's recommendation, the record, and the applicable law, the court is of the opinion that the motion should be denied.

I.   Background

Balderas-Mejia's offense of conviction stems from his involvement in a drug-trafficking conspiracy. On August 13, 2014, a federal grand jury in the Eastern District of Texas returned a five-count First Superseding Indictment charging Balderas-Mejia and 46 codefendants in Count 1 with Conspiracy to Possess With Intent to Manufacture and Distribute 5 Kilograms or More of Cocaine, in violation of 21 U.S.C. § 846; in Count 2 with Conspiracy to Possess With Intent to Manufacture and Distribute 1,000 Kilograms or More of Marijuana, in violation of 21 U.S.C. § 846; in Count 3 with Conspiracy to Import Cocaine and to Manufacture and Distribute Cocaine Intending and Knowing the Cocaine Will Be Unlawfully Imported Into the United States, in

violation of 21 U.S.C. § 963; in Count 4 with Manufacturing and Distributing Cocaine Intending and Knowing the Cocaine Will Be Unlawfully Imported Into the United States, in violation of 21 U.S.C. § 959; and in Count 5 with Conspiracy to Commit Money Laundering, in violation of 18 U.S.C. § 1956(h). On March 30, 2017, Balderas-Mejia pleaded guilty to Count 1 of the First Superseding Indictment pursuant to a binding plea agreement. Subsequently, on April 21, 2017, the court sentenced Balderas-Mejia to 168 months' imprisonment, followed by a 5-year term of supervised release. The court ordered that Balderas-Mejia's sentence run concurrently with his term of imprisonment imposed in Case No. 2:13CR01344-1 in the Western District of Texas. Balderas-Mejia is currently housed at Federal Correctional Institution El Reno, located in El Reno, Oklahoma ("FCI El Reno"). His projected release date is September 22, 2029.

II.  Analysis

    A.  Exhaustion of Administrative Remedies

On December 21, 2018, former President Trump signed the First Step Act of 2018 into law. *See* First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194. The Act, in part, amended 18 U.S.C. § 3582(c), which gives the court discretion, in certain circumstances, to reduce a defendant's term of imprisonment:

> The court, upon motion of the Director of the Bureau of Prisons ("BOP"), or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that extraordinary and compelling reasons warrant such a reduction; or the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a

> determination has been made by the Director of the [BOP] that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g); and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

18 U.S.C. § 3582(c)(1)(A). This provision is commonly referred to as "compassionate release."

Prior to the First Step Act, only the Director of the BOP could file a motion seeking compassionate release. *See United States v. Franco*, 973 F.3d 465, 467 (5th Cir. 2020) ("Prior to the passage of the First Step Act . . . courts lacked the power to adjudicate motions for compassionate release."), *cert. denied*, 141 S. Ct. 920 (2020); *Tuozzo v. Shartle*, No. 13-4897, 2014 WL 806450, at *2 (D.N.J. Feb. 27, 2014) (denying petitioner's motion for compassionate release because no motion for his release was filed by the BOP). The First Step Act amended § 3582(c) by providing a defendant the means to appeal the BOP's decision not to file a motion for compassionate release on the defendant's behalf. *United States v. Cantu*, 423 F. Supp. 3d 345, 347 (S.D. Tex. 2019); *United States v. Bell*, No. 3:93-CR-302-M, 2019 WL 1531859, at *1 (N.D. Tex. Apr. 9, 2019). The plain language of the statute, however, makes it clear that the court may not grant a defendant's motion for compassionate release unless the defendant has complied with the administrative exhaustion requirement. 18 U.S.C. § 3582(c)(1)(A); *Franco*, 973 F.3d at 467 (holding that the statutory requirement that a defendant file a request with the BOP before filing a motion for compassionate release in federal court "is *not* jurisdictional but that it *is* mandatory"); *United States v. Alam*, 960 F.3d 831, 833 (6th Cir. 2020) ("Even though [the] exhaustion requirement does not implicate [the court's] subject-matter jurisdiction, it remains a mandatory condition."); *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020) ("[T]he exhaustion requirement . . . presents a glaring roadblock foreclosing compassionate release."). Thus, before seeking relief from the court, a defendant must first submit a request to the warden

3

of his facility to move for compassionate release on his behalf and then either exhaust his administrative remedies or wait for the lapse of 30 days after the warden received the request. 18 U.S.C. § 3582(c)(1)(A); *Franco*, 973 F.3d at 467 ("The text . . . outlines two routes a defendant's motion can follow to be properly before the court. Both routes begin with the defendant requesting that 'the [BOP]' 'bring a motion on the defendant's behalf.'"); *United States v. Harris*, 812 F. App'x 106, 107 (3d Cir. 2020); *United States v. Springer*, 820 F. App'x 788, 791 (10th Cir. 2020) (defendant "was required to request that the BOP file a compassionate-release motion on his behalf to initiate his administrative remedies" (citing *Raia*, 954 F.3d at 595)); *Alam*, 960 F.3d at 833-34; *United States v. Soliz*, No. 2:16-190-3, 2020 WL 2500127, at *3 (S.D. Tex. May 14, 2020) ("§ 3582(c)(1)(A) does not provide this Court with the equitable authority to excuse [defendant's] failure to exhaust his administrative remedies or to waive the 30-day waiting period." (quoting *United States v. Reeves*, No. 18-00294, 2020 WL 1816496, at *2 (W.D. La. Apr. 9, 2020))).

Here, Balderas-Mejia attached to his motion a copy of a letter, dated July 6, 2020, requesting home confinement that he allegedly submitted to the warden of Federal Correctional Institution Beaumont Low ("FCI Beaumont Low"), the facility where he was housed at the time.[4] According to an attorney with the BOP, Balderas-Mejia did not submit a request for Compassionate Release or Reduction in Sentence to the warden of FCI Beaumont Low. Probation's investigation revealed that Balderas-Mejia filed an administrative remedy request on July 27, 2020, which was rejected on August 4, 2020; however, there is no indication that this request pertained to compassionate release. Thus, it is unclear whether Balderas-Mejia has

---

[4] Balderas-Mejia was transferred to FCI El Reno on February 23, 2021.

exhausted his administrative remedies. Moreover, even if he had complied with the exhaustion requirement before filing the instant motion, nothing in his motion indicates that extraordinary and compelling reasons exist to release him from confinement.

Congress did not define "extraordinary and compelling." Rather, it elected to delegate its authority to the United States Sentencing Commission ("the Commission"). *See* 28 U.S.C. § 994(t) ("The Commission, in promulgating general policy statements regarding the sentencing modification provisions in section 3582(c)(1)(A) of title 18, shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples."); *see also* U.S. SENTENCING GUIDELINES MANUAL § 1B1.13 (U.S. SENTENCING COMM'N 2018) ("USSG"). In Application Note 1 to § 1B1.13 of the USSG, the Commission defined "extraordinary and compelling reasons" to include the following four categories of circumstances: (i) certain medical conditions of the defendant; (ii) the defendant is 65 years or older and meets other requirements; (iii) the defendant's family has specified needs for a caregiver; and (iv) other reasons in the defendant's case that establish an extraordinary and compelling reason. The court must also consider the factors set forth in 18 U.S.C. § 3553(a),[1] as applicable, and find that the sentence modification is consistent with the policy statements issued by the Commission. 18 U.S.C. § 3582(c)(1)(A). The policy statement

---

[1] Section 3553(a) directs courts to consider: the nature and circumstances of the offense and the defendant's history and characteristics; the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; the need to deter criminal conduct; the need to protect the public; the need to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; the kinds of sentences and sentencing ranges established for defendants with similar characteristics under applicable USSG provisions and policy statements; any pertinent policy statement of the Commission in effect on the date of sentencing; the need to avoid unwarranted disparities among similar defendants; and the need to provide restitution to the victim. 18 U.S.C. § 3553(a).

regarding compassionate release requires a determination that "the defendant is not a danger to the safety of any other person or to the community." U.S.S.G. § 1B1.13(2).

### A. Medical Condition

In the instant motion, Balderas-Mejia, age 41, contends that he is eligible for compassionate release due to a variety of medical conditions—specifically, that he suffers from hypertension, high cholesterol, hyperthyroidism, primary cardiomyopathy, asthma, two dislocated discs, and sleep apnea. The USSG provides that extraordinary and compelling reasons exist regarding a defendant's medical condition when the defendant is "suffering from a terminal illness (*i.e.*, a serious and advanced illness with an end of life trajectory)" or when a defendant is "suffering from a serious physical or medical condition," "suffering from a serious functional or cognitive impairment," or "experiencing deteriorating physical or mental health because of the aging process, that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." U.S.S.G. § 1B1.13 cmt. n.1(A).

According to Balderas-Mejia's Presentence Investigation Report ("PSR"), prepared in April 2017, he stated that he was suffering from a dislocated disc and high blood pressure and reported that he had two minor cardiac arrests in 2005 and 2006. He also informed Probation that he was taking various medications. Balderas-Mejia's BOP medical records reveal that he has been diagnosed with hypothyroidism, hyperlipidemia, myopia, essential (primary) hypertension (high blood pressure), dermatitis, and low back pain; however, there is no indication that he suffers from hyperthyroidism, cardiomyopathy, asthma, or sleep apnea. Balderas-Mejia also has a body mass index of between 40 and 44.9, which surpasses the threshold for obesity according to the

Centers for Disease Control and Prevention ("CDC"). Balderas-Mejia is currently prescribed aspirin to treat his hyperlipidemia and hypertension, atorvastatin for his hyperlipidemia, hydrochlorothiazide for his hypertension, levothyroxine sodium to treat his hypothyroidism and hypertension, naproxen for his low back pain, and two creams to treat his dermatitis. In a BOP medical record dated May 19, 2020, Sreedhar Polavarapu, M.D., indicates that Balderas-Mejia's hypertension is "stable on meds." With regard to hypothyroidism, Dr. Polavarapu describes his condition as "clinically euthyroid," denoting a normally functioning thyroid gland.

Balderas-Mejia is classified as a BOP medical Care Level 2 inmate. According to the BOP's Clinical Practice Guidance, dated May 2019, Care Level 2 inmates "are stable outpatients who require clinician evaluations monthly to every 6 months. Their medical . . . conditions can be managed through routine, regularly scheduled appointments with clinicians for monitoring. Enhanced medical resources, such as consultation or evaluation by medical specialists, may be required from time to time." Balderas-Mejia's medical summary does not meet the criteria listed above. None of his medical conditions are terminal or substantially diminish his ability to provide self-care. *See United States v. Thompson*, 984 F.3d 431, 433 (5th Cir. 2021). To the contrary, Balderas-Mejia's conditions are well managed with medication. *See id.* The court acknowledges that according to the CDC website some of Balderas-Mejia's underlying medical conditions, specifically, obesity and hypertension, place him at a higher risk of severe symptoms should he contract COVID-19[2]; nonetheless, such commonplace maladies do not make his case "extraordinary." *See id*. at 434.

---

[2] In relevant part, the CDC states that adults with obesity are at an increased risk of severe illness, while adults with high blood pressure might be at an increased risk for severe illness.

According to the CDC, 42.5% of the adult population in the United States is obese and 73.6% is overweight. In addition, the CDC reports that nearly half of the adult population in the United States has hypertension and approximately 12% of the population has high cholesterol (hyperlipidemia). Due to their prevalence, obesity, hypertension, and hyperlipidemia cannot be deemed "extraordinary" in order to merit compassionate release. *See id.* (noting that neither hypertension nor high cholesterol made the defendant's case "extraordinary" because "nearly half of the adult population in the United States suffers from hypertension" and "roughly 12% of Americans suffer from high cholesterol"); *United States v. Harmon*, 834 F. App'x 101, 101 (5th Cir. 2021) (affirming denial of compassionate release to a 52-year-old woman who was obese with a body mass index of 36); *United States v. Williams*, No. CR 15-83-SDD-EWD, 2021 WL 414825, at *3 (M.D. La. Feb. 5, 2021) (denying compassionate release to inmate with Type 2 diabetes and obesity because there was no evidence these conditions had diminished his ability to provide self-care within the facility); *United States v. Grant*, No. 16-00172-01, 2021 WL 149308, at *4 (W.D. La. January 15, 2021) (noting that "while obesity is an underlying medical condition that poses increased risk of severe illness from COVID-19, courts have found that obesity—alone or even paired with other medical conditions—does not provide adequate grounds for compassionate release"); *United States v. Sentimore*, No. 04-382, 2020 WL 7630778, at *2 (E.D. La. Dec. 22, 2020) (finding that defendant's morbid obesity did not rise to the level of an extraordinary and compelling circumstance that would justify his early release); *United States v. Cotto*, No. CV 16-36, 2020 WL 5761192, at *2 (E.D. La. Sept. 28, 2020) (recognizing the seriousness of diabetes and obesity but denying compassionate release because inmate had not shown that he was unable to take care of himself within the confines of the facility or that BOP

could not manage his medical conditions appropriately in view of medical records showing that he was being administered the necessary care); *United States v. Durham*, No. 3:18-cr-251-MOC-DCK-1, 2020 WL 5577884, at *2 (W.D.N.C. Sept. 17, 2020) (finding the fact that the defendant has hypertension, a condition that may increase his risk for severe illness from COVID-19, without more, does not present an "extraordinary and compelling reason" for compassionate release); *United States v. Wilson*, No. 2:18cr132, 2020 WL 4901714, at *5 (W.D. Wash. Aug. 20, 2020) (rejecting the notion that inmate's hypertension claim was sufficient to justify early termination of sentence); *United States v. Gordon*, No. 15-20609, 2020 WL 3971013, at *3 (E.D. Mich. July 14, 2020) (denying compassionate release to an obese defendant, reasoning that because "42.4% of American adults are obese and [an] additional 32% are overweight," obesity "is not a condition so [extraordinary] that injustice would result if the relief is not granted"). In fact, Balderas-Mejia's BOP records reveal that he has no medical restrictions, has regular duty work assignments, and is cleared for food service. Thus, Balderas-Mejia has failed to establish that a qualifying medical condition exists that would constitute an extraordinary and compelling reason to reduce his sentence.

C.     "Other" Reasons[3]

Balderas-Mejia's request for compassionate release potentially falls into the fourth, catch-all category of "other" extraordinary and compelling reasons, which specifically states that the Director of the BOP shall determine whether "there exists in the defendant's case an

---

[3] Balderas-Mejia attached to his motion a copy of another inmate's motion for compassionate release that Balderas-Mejia slightly altered. The motion references a § 2255 motion even though Balderas-Mejia has not filed such a motion. Balderas-Mejia even includes a notation: "This Page is Hypothetical as if I rendered the 2255." The court will not address hypothetical issues or issues Balderas-Mejia clearly did not raise in the motion before the court.

extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." U.S.S.G. § 1B1.13 cmt. n.1(D). Although Subdivision D is reserved to the BOP Director, the Commission acknowledged, even before the passage of the First Step Act, that courts are in the position to determine whether extraordinary and compelling circumstances are present. *United States v. Beck*, 425 F. Supp. 3d 573, 583 (M.D.N.C. 2019) ("Read in light of the First Step Act, it is consistent with the previous policy statement and with the Commission guidance more generally for courts to exercise similar discretion as that previously reserved to the BOP Director in evaluating motions by defendants for compassionate release."); *see Cantu*, 423 F. Supp. 3d at 352 ("[T]he correct interpretation of § 3582(c)(1)(A) . . . is that when a defendant brings a motion for a sentence reduction under the amended provision, the Court can determine whether any extraordinary and compelling reasons other than those delineated in U.S.S.G. § 1B1.13 cmt. n.1(A)-(C) warrant granting relief.").

In the case at bar, there is no indication that the BOP Director made a determination regarding the presence of extraordinary and compelling reasons with respect to Balderas-Mejia for any "other" reason. It is well settled that "compassionate release is discretionary, not mandatory." *United States v. Chambliss*, 948 F.3d 691, 693 (5th Cir. 2020). Where, as here, a prisoner has engaged in "severe" criminal conduct, the district court has discretion to deny compassionate release after weighing the evidence. *Id.* at 693-94. In exercising its discretion, the court finds that no extraordinary and compelling reasons exist in relation to Balderas-Mejia's situation.

Balderas-Mejia maintains that if he contracts COVID-19 it will be fatal for him due to prison overcrowding and there being no way to distance himself from other inmates.

Nevertheless, as of March 24, 2021, the figures available at www.bop.gov list 0 inmates (out of a total inmate population of 987) and 0 staff members at FCI El Reno as having confirmed positive cases of COVID-19, 591 inmates and 48 staff members who have recovered, and 1 inmate who succumbed to the disease. Indeed, according to Balderas-Mejia's medical records, he tested positive for COVID-19 on November 25, 2020, and, as of December 8, 2020, he had recovered from the virus. On that date, Nurse Practitioner S. Henderson observed that Balderas-Mejia "is not severely immunocompromised and did not have a severe illness requiring hospitalization." Thus, it appears that the facility where Balderas-Mejia is housed is handling the outbreak appropriately and providing adequate medical care.

Although Balderas-Mejia expresses legitimate concerns regarding COVID-19, he does not establish that the BOP cannot manage the outbreak within his correctional facility or that the facility is specifically unable to treat Balderas-Mejia, if he were to contract the virus once again and develop COVID-19 symptoms, while incarcerated. *See Thompson*, 984 F.3d at 435 ("Fear of COVID doesn't automatically entitle a prisoner to release."); *Raia*, 954 F.3d at 597 ("[T]he mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread."); *United States v. Banks*, No. CR 15-0080-02, 2020 WL 6839267, at *4 (W.D. La. Nov. 20, 2020) ("This Court cannot equate the generalized fear of COVID-19 to an extraordinary and compelling reason to support compassionate release, nor will it undermine BOP's criteria to determine eligibility for sentence reductions or home confinement."); *United States v. Woods*, No. 4:11-CR-106-SDJ, 2020 WL 6391591, at *4 (E.D. Tex. Nov. 2, 2020) (noting that "courts have concluded that an

inmate's concerns about risks associated with the spread of COVID-19 are not consistent with the policy statement of the Commission as required by Section 3582(c)(1)(A)"); *United States v. Vasquez*, No. CR 2:18-1282-S-1, 2020 WL 3000709, at *3 (S.D. Tex. June 2, 2020) ("General concerns about the spread of COVID-19 or the mere fear of contracting an illness in prison are insufficient grounds to establish the extraordinary and compelling reasons necessary to reduce a sentence." (quoting *United States v. Koons*, 455 F. Supp. 3d 285, 292 (W.D. La. 2020))); *United States v. Clark*, 451 F. Supp. 3d 651, 656 (M.D. La. 2020) (finding the defendant had failed to present extraordinary and compelling reasons to modify his prison sentence because he "does not meet any of the criteria set forth by the statute" and he "cites no authority for the proposition that the fear of contracting a communicable disease warrants a sentence modification"). Furthermore, contracting the virus while incarcerated, even in conjunction with preexisting health conditions, is insufficient to establish exceptional and compelling circumstances warranting compassionate release. *See United States v. Jackson*, No. 3:16-CR-196-L-1, 2020 WL 4365633, at *2 (N.D. Tex. July 30, 2020) (finding that defendant had failed to present extraordinary and compelling reasons for compassionate release despite suffering from previous underlying health conditions and testing positive for COVID-19).

Moreover, courts have repeatedly denied COVID-19-based motions for compassionate release filed by inmates who, like Balderas-Mejia, have already contracted and recovered from the virus. *See*, *e.g.*, *United States v. Gipson*, 829 F. App'x 780, 781 (9th Cir. 2020) (affirming denial of compassionate release for a defendant with preexisting conditions who had already contracted COVID); *United States v. Marley*, No. 16-CR-374 (VEC), 2020 WL 7768406, at *2 (S.D.N.Y. Dec. 30, 2020) (quoting *United States v. Delorbe-Luna*, No. 18-CR-384, 2020 WL 7231060, at

12

\*2 (S.D.N.Y. Dec. 7, 2020) ("[A] defendant's successful recovery from COVID-19 weighs against granting that defendant compassionate release.")); *United States v. Stockman*, No. H-17-116-2, 2020 WL 5269756, at \*3 (S.D. Tex. Aug. 26, 2020) (noting that when an inmate is infected and recovers from COVID-19, the courts have found the risks of infection or severe symptoms or effects because of underlying conditions change and diminish); *United States v. Baker*, No. CR 16-179, 2020 WL 4584195, at \*4 (E.D. La. Aug. 10, 2020) ("Courts have denied COVID-19-based motions for compassionate release filed by inmates who have already contracted the virus."); *United States v. Neal*, No. CR 11-28, 2020 WL 4334792, at \*1 (E.D. La. July 28, 2020) ("Courts have repeatedly found that defendants who contract COVID-19 and recover are not among those who fall within the guidelines or demonstrate 'extraordinary and compelling reasons,' meriting a reduction in their sentence."); *United States v. Shrout*, No. 15-CR-438, 2020 WL 3483703, at \*4 (D. Or. June 26, 2020) ("[Defendant] has already contracted COVID-19 and, crucially, the BOP has properly managed the disease."); *United States v. Gallegos*, No. 4:17-CR-568, 2020 WL 3403032, at \*3 (S.D. Tex. June 19, 2020) ("Having already contracted and fully recovered from COVID-19, the Court cannot say that Defendant's asthma 'substantially diminishes [his] ability . . . to provide self-care within the environment of a correctional facility.'" (quoting U.S.S.G. § 1B1.13)). Therefore, Balderas-Mejia has failed to establish that a qualifying medical condition or other reasons exist that would constitute extraordinary and compelling reasons to release him from prison.

### D.     Section 3553(a) Factors

The court further finds that compassionate release is not merited in light of the applicable factors set forth in § 3553(a). *See* 18 U.S.C. § 3582(c)(1)(A) (requiring courts to consider the

§ 3553(a) factors before granting compassionate release); *Thompson*, 984 F.3d at 435 n.11 (collecting cases); *Chambliss*, 948 F.3d at 693-94. Balderas-Mejia's offense of conviction entails his participation in a large-scale, international drug-trafficking conspiracy involving the distribution of between 150 and 450 kilograms of cocaine. As part of the conspiracy, Balderas-Mejia supplied coconspirators with kilogram quantities of cocaine from various sources for distribution to others in the Eastern and Northern Districts of Texas. Balderas-Mejia began his drug-dealing activities as early as 2005, at which time he distributed cocaine for his own profit, provided stash houses for the storage of drugs, and was the drug load coordinator for multiple drug trafficking organizations. At the time of his offense of conviction, Balderas-Mejia worked on behalf of the Los Zetas drug cartel as well as other Mexican drug trafficking organizations. He was a source of supply of cocaine and marijuana in Texas and other states as far north as Minnesota. Balderas-Mejia received cocaine from the Los Zetas cartel and oversaw its storage in Eagle Pass, Texas, before it was delivered to other destinations in the United States. Balderas-Mejia also coordinated the transportation and delivery of marijuana to the Dallas and San Antonio, Texas, areas. In December 2009, a search of a stash house used by Balderas-Mejia resulted in the seizure of approximately 1,133 kilograms of marijuana. A cooperating source informed law enforcement that from 2005 to 2011, Balderas-Mejia received approximately 500 to 2,000 kilograms of marijuana per week, and on two or three separate occasions, he received over 300 kilograms of cocaine. Further, Balderas-Mejia frequently smuggled bulk cash drug proceeds from the United States to Mexico. When arrested, he was in possession of a loaded, gold-plated .45 caliber handgun, found under his mattress, which he was known to carry when handling narcotics transactions.

Balderas-Mejia's criminal history includes a prior conviction for conspiracy to possess with intent to distribute cocaine in the Western District of Texas. According to Probation, Balderas-Mejia has committed a number of disciplinary infractions while in BOP custody, including citations for possessing drugs/alcohol, disruptive conduct, possessing a hazardous tool, and possessing a cell phone. Moreover, Balderas-Mejia has a history of substance abuse, including the use of alcohol and cocaine up to a week before his arrest. In view of the nature and circumstances of his offense of conviction, his criminal history, his disciplinary infractions while incarcerated, and his history of substance abuse, the court cannot conclude that Balderas-Mejia would not pose a danger to any other person or to the community, if released from prison.

In addition, granting Balderas-Mejia compassionate release would fail to provide just punishment for his offense and promote respect for the law. In *Chambliss*, the United States Court of Appeals for the Fifth Circuit upheld the denial of compassionate release due to the defendant's not yet having served a significant portion of his sentence. 948 F.3d at 694. The district court determined that the defendant's terminal illness "constitut[ed] 'an extraordinary and compelling reason for a sentence reduction' and that he '[did] not present a danger upon release,'" but denied release because "releasing [the defendant] after serving only 14 years of a 30-year sentence minimizes both the impact of [the defendant's] crime and seriousness of the offense." *Id.* at 693-94. "Moreover, the [district] court, citing the § 3553(a) factors, determined that requiring [the defendant] to serve the remainder of his sentence would 'provide just punishment for the offense' and 'afford adequate deterrence to criminal conduct.'" *Id.* at 693-94; *see Thompson*, 984 F.3d at 434-35 (observing that the courts that have granted compassionate release "largely have done so for defendants who had already served the lion's share of their sentences and presented multiple,

15

severe, health concerns"). In the instant case, releasing Balderas-Mejia after he has served only approximately 45% of his 168-month sentence would similarly minimize the impact of his crime and the seriousness of his offense.

      E.      Home Confinement

In his motion, Balderas-Mejia urges the court to place him on "home confinement." The BOP, however, has the exclusive authority to determine where a prisoner is housed; thus, the court is without authority to order home confinement. 18 U.S.C. § 3621(b); *Cheek v. Warden of Fed. Med. Ctr.*, 835 F. App'x 737, 739 (5th Cir. 2020) (holding that "the pandemic did not create judicial authority to grant home confinement"); *United States v. Donnell*, 476 F. Supp. 3d 514, 522 (E.D. Tex. 2020); *Ambriz v. United States*, 465 F. Supp. 3d 630, 633 (N.D. Tex. 2020); *United States v. Miller*, No. 2:17-CR-015-D (02), 2020 WL 2514887, at *1 (N.D. Tex. May 15, 2020) ("[N]either the CARES Act nor the First Step Act authorizes the court to release an inmate to home confinement."). Indeed, "[n]o inmate has a constitutional right to be housed in a particular place or any constitutional right to early release." *Cheek*, 835 F. App'x at 740. "It is not for a court to step in and mandate home confinement for prisoners, regardless of an international pandemic." *Id*.

Furthermore, the BOP has instituted a comprehensive management approach that includes screening, testing, appropriate treatment, prevention, education, and infection control measures in response to COVID-19. In response to a directive from the former United States Attorney General in March 2020, the BOP immediately began reviewing all inmates who have COVID-19 risk factors, as described by the CDC, for the purpose of determining which inmates are suitable for placement on home confinement. *See United States v. Collins*, No. CR 04-50170-04, 2020

16

WL 1929844, at *3 (W.D. La. Apr. 20, 2020). The BOP notes that inmates need not apply to be considered for home confinement, as this is being done automatically by case management staff. Since March 26, 2020, the BOP has placed 23,222 inmates on home confinement. The March 2020 directive is limited to "eligible at-risk inmates who are non-violent and pose minimal likelihood of recidivism and who might be safer serving their sentences in home confinement rather than in BOP facilities." *United States v. Castillo*, No. CR 2:13-852-1, 2020 WL 3000799, at *3 (S.D. Tex. June 2, 2020).

In his Memorandum to the BOP dated March 26, 2020, former Attorney General Barr acknowledges that the Department of Justice ("DOJ") has an obligation to protect both BOP personnel and inmates. He also notes that the DOJ has the responsibility of protecting the public, meaning that "we cannot take any risk of transferring inmates to home confinement that will contribute to the spread of COVID-19 or put the public at risk in other ways." The Attorney General issued a subsequent Memorandum to the BOP on April 3, 2020, in which he emphasizes that police officers protecting the public face an increased risk from COVID-19 and cannot avoid exposure to the virus, with their numbers dwindling as officers who contract the virus become ill or die or need to recover or quarantine to avoid spreading the disease. Accordingly, he cautions:

> The last thing our massively over-burdened police forces need right now is the indiscriminate release of thousands of prisoners onto the streets without any verification that those prisoners will follow the laws when they are released, that they have a safe place to go where they will not be mingling with their old criminal associates, and that they will not return to their old ways as soon as they walk through the prison gates.

As the court noted in *United States v. Preston*, "[t]he best predictor of how [Defendant] will behave if he were to be released is how he behaved in the past, and his track record is a poor one." No. 3:18-CR-307-K, 2020 WL 1819888, at *4 (N.D. Tex. Apr. 11, 2020) (quoting *United*

17

*States v. Martin*, 447 F. Supp. 3d 399, 403 (D. Md. 2020)). In this instance, there is no reason to believe that Balderas-Mejia would not revert to his drug-dealing and drug-abusing behavior if released from prison at this time.

III.     Conclusion

In short, Balderas-Mejia has failed to satisfy his burden of showing the necessary circumstances to warrant relief under the statutory framework to which the court must adhere. *See United States v. Dodge*, No. 17-323-01, 2020 WL 3668765, at *5 (W.D. La. July 6, 2020) (stressing that "the rampant spread of the coronavirus and the conditions of confinement in jail, alone, are not sufficient grounds to justify a finding of extraordinary and compelling circumstances"); *Koons*, 455 F. Supp. 3d at 291-92 (same). As the court observed in *Koons*, rejecting the notion that it has "carte blanche" authority to release whomever it chooses, "[t]he Court cannot release every prisoner at risk of contracting COVID-19 because the Court would then be obligated to release every prisoner." *Dodge*, 2020 WL 3668765, at *6; *Koons*, 455 F. Supp. 3d at 292.

In accordance with the foregoing analysis, Balderas-Mejia's Motion to Compel Compassionate Release (#944) is DENIED.

SIGNED at Beaumont, Texas, this 25th day of March, 2021.

*(signature)*
MARCIA A. CRONE
UNITED STATES DISTRICT JUDGE